

**ORDERED in the Southern District of Florida on May 15, 2012.**

A. Jay Cristol, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re                                                    Case No. 11-31948-BKC-AJC

TRAILER PARK ACQUISITION, LLC,          Chapter 11
    Debtor.
_____/

**MEMORANDUM OPINION AND ORDER GRANTING
DEBTOR'S MOTION TO VALUE COLLATERAL**

THIS MATTER is before the Court on the Debtor's Motion to Value Collateral [ECF No. 237] (the "Motion") and the Response to the Motion [ECF No. 328] (the "Response") filed by Branch Banking & Trust Co. ("BB&T"). The Court held a preliminary hearing on the Motion on January 25, 2012, and subsequently entered an Order [ECF No. 296] setting the Motion for evidentiary hearing on April 12, 2012 (the "Evidentiary Hearing"). For the reasons set forth

1

herein, the Court grants the Motion and determines the as-is market value of a fee simple interest in the Property (as defined herein) is $1,875,000.00 as of April 12, 2012.

## BACKGROUND AND PROCEDURAL HISTORY

    A.    **The Property**

    1.    On August 4, 2011 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since that time, the Debtor has operated as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

    2.    The Debtor is the fee simple owner of approximately six (6) acres of real property located at 7600 NW 27th Avenue, Miami, Florida (the "Property"). The Debtor's Property is currently being operated as a mobile home trailer park community known as the Palm Lake Mobile Home Park. The Property contains approximately 118 individually owned mobile homes which rent land at the Property from the Debtor.

    3.    BB&T has filed Claim No. 3-1 against the Debtor's estate, asserting a debt in the amount of $11,061,625.04, allegedly secured by the Property. The validity, priority and extent of BB&T's claim, including its lien against the Property, is subject to dispute in a pending adversary proceeding, Adv. No. 11-2728-AJC.

    B.    **The Evidentiary Hearing**

    6.    The Court held the Evidentiary Hearing on the Motion on April 12, 2012 at 2:00 p.m. At the Evidentiary Hearing, the Court heard testimony from the Debtor's witness, Alexandra D. Londono of Colliers International Valuation & Advisory Service ("Ms. Londono"). Ms. Londono holds the MAI designation from the Appraisal Institute and is a duly licensed Certified General Real Estate Appraiser in the State of Florida. Ms. Londono was admitted by

the Court as an expert in the area of real property valuation. *See* Trans. of Evidentiary Hearing, p. 4:2-3.

7. At the Evidentiary Hearing, the Court also heard testimony from BB&T's witness, Scott M. Powell of Integra Realty Resources ("Mr. Powell"). Mr. Powell holds the MAI designation from the Appraisal Institute and is a duly licensed Certified General Real Estate Appraiser in the State of Florida. Mr. Powell was admitted by the Court as an expert in the area of real property valuation. *See* Trans. of Evidentiary Hearing, p. 49:14-15.

8. Both the Debtor and BB&T submitted exhibits and an exhibit register for the Court's consideration at the Evidentiary Hearing, and each party stipulated on the record to the admissibility into evidence of the other party's exhibits. *See* Trans. of Evidentiary Hearing, p. 7:12-13.

9. The Court, having heard the testimony of Ms. Londono and Mr. Powell on direct examination and cross examination, and as to Mr. Powell, on re-direct examination; having reviewed the exhibits introduced by the parties; and having reviewed the Motion, the Response and the Record in this case, makes the following findings of fact and conclusions of law.[1]

## CONCLUSIONS OF LAW

I. **JURISDICTION**

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Findings of fact designated as conclusions of law shall be construed as findings of fact, and conclusions of law designated as findings of fact shall be construed as conclusions of law.

## II. STATUTORY AUTHORITIES

The statutory authorities which govern the relief requested by the Debtor in the Motion are 11 U.S.C. § 506, Fed. R. Bankr. P. 3012, and Local Rule 3012-1. Section 506(a)(1) provides in pertinent part that:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest. . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

In turn, Fed. R. Bankr. P. 3012 provides that:

> The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

Obtaining a valuation of the Property is a critical component of the Debtor's reorganization efforts, because the value of the Property is necessary for the Debtor and the Court to determine the proper treatment of BB&T's claim under the Debtor's plan of reorganization. Accordingly, the Court concludes that it is appropriate to determine the value of the Property for the purposes stated in the Motion under the applicable statutory authorities.

## **FINDINGS OF FACT**

The Court finds that the Debtor properly served notice of the Motion and the Evidentiary Hearing on all parties entitled to receive such notice, and that no other or further notice of the Motion or the Evidentiary Hearing is or shall be required.

The Court finds that both Ms. Londono and Mr. Powell are competent in the field of real property valuation. However, for the reasons explained herein, the Court finds Ms. Londono's testimony and ultimate conclusion as to the value of the Property to be more reliable than the testimony and ultimate conclusion of value presented by Mr. Powell.

At the outset, the Court notes that neither expert relied on the cost approach to valuation, and both experts placed minimal emphasis on the land sales comparison approach and the improved sales comparison approach. *See* Debtor's Exh. 1 at p. 101 and BB&T's Exh. A at p. 7 (as modified by BB&T's Exhibit B) and p. 74. Instead, both experts relied most heavily on, and placed the most emphasis upon the income capitalization approach to value, finding it to be the most reliable method of valuation for the Property. *See* Debtor's Exh. 1 at p. 101 and BB&T's Exh. A at p. 7 (as modified by BB&T's Exhibit B) and p. 74. *See also* Trans. of Evidentiary Hearing at p. 68:21-25 and p. 69:1-18. Because both experts found the income capitalization approach to be the most reliable method of valuation of the Property, the Court will value the Property based upon the income capitalization approach.

The income capitalization approach to value is based on the premise that properties similar to the subject Property are income producing, and that investors purchase these properties based upon their income producing ability. So, market rents for the subject property are estimated, the applicable operating expenses are deducted, and the resulting net income is capitalized into a value estimate. *See* Debtor's Exh. 1 at p. 64. The Court has carefully reviewed each expert's testimony as to each of the elements of their income capitalization analysis.

First, both experts agreed that the annualized rental income for the Property is $711,480.00. *See* Debtor's Exh. 1 at p. 81 and BB&T's Exh. A at p. 73. However, Ms. Londono also included an additional $1,200.00 of annualized income for the Debtor derived from the

laundry facilities at the Property.  Mr. Powell did not take into account any income from the laundry facilities at the Property.

The experts disagreed on the appropriate vacancy and credit loss factor to be applied to the potential gross income from the Property.  Ms. Londono derived a 10% vacancy and credit loss factor based on the inherent vacancy factor associated with every property, as well as the monthly past due rent collections as reflected in the Debtor's monthly operating report.  *See* Trans. of Evidentiary Hearing at p. 13:3-10.  In contrast, Mr. Powell derived a 7.5% vacancy and credit loss factor upon consideration of the submarket vacancy rate and vacancy rates at competing properties, as well as the vacancy and credit loss rate typically applied by investors in fully occupied residential investments.  *See* BB&T's Exh. A at p. 69.  The Court is persuaded that Ms. Londono's calculation of a 10% vacancy and credit loss factor based upon both market considerations and the Debtor's historical past due collections is more accurate than Mr. Powell's calculation.

The parties' experts also disagreed significantly on the calculation of operating expenses for the Property and the appropriate capitalization rate to be used in respect of the Property.  Ms. Londono estimated the Property's total annualized operating expenses at $330,141.00 for an annualized net operating income of $311,391.00, and applied a capitalization rate of 12.50%.  *See* Debtor's Exh. 1 at p. 81. Mr. Powell estimated the Property's total annualized operating expenses at $216,709.00 for an annualized net operating income of $441,410.00, and applied a capitalization rate of 10.00%.  *See* BB&T's Exh. A at p. 73.  For the reasons explained below, the Court finds Ms. Lonodo's calculation of the net operating income and capitalization rate most credible and reliable.

In calculating the net operating income for the Property, operating expenses should include those items necessary to maintain the Property and generate income at the forecasted level. *See* Debtor's Exh. 1 at p. 75. Ms. Londono separated the various expense items into nine distinct categories which are explained in detail in Ms. Londono's report and testimony. *See* Debtor's Exh. A at pp. 77-78 and Trans. of Evidentiary Hearing, pp. 14-16. As to the sources of information utilized by Ms. Londono in calculating these expenses, Ms. Londono testified as follows:

> For the real estate taxes, I contacted the Miami-Dade County Property Appraiser's Office and consulted with regards to the tax bill for the property. For insurance, I contacted insurers, brokers in Miami-Dade County. For utilities, I consulted with the DIP report as well as another report. For water, I looked at the actual water bills for the property. For trash removal, I consulted with the DIP reports as well as another report. For maintenance and repairs, that was based on DIP reports. Off-site management was based on industry standards. Payroll benefits was based on information I gathered within the marketplace with regards to standard expenses for payroll for that particular area. General administrative was from the DIP reports as well as my professional opinion.

Trans. of Evidentiary Hearing, pp. 15-16: 17-25 and 1-9. Because of the diverse resources consulted and utilized by Ms. Londono in calculating expense items as well as determining which expenses are necessary to maintain the Property and generate the forecasted income, the Court finds Ms. Londono's calculation of the Property's estimated operating expenses to be thorough and accurate.

Mr. Powell separated expense items into eight separate categories. *See* BB&T's Exh. A at p. 69. Mr. Powell's report states that the operating expenses were based on the operating history of the Property and earlier discussions with a property manager, both of which were obtained in connection with an earlier appraisal report prepared by Mr. Powell and dated January 26, 2011. *See* BB&T's Exh. A at p. 69 and Debtor's Exh. 2. That is, in calculating operating expenses, Mr. Powell relied upon historical operational information for the Property for the first

7

six months of 2010 (*see* Debtor's Exh. 15 at p. 5:6-11) and discussions with a property manager at some time prior to completion of the appraisal dated January 26, 2011. *See* Debtor's Exh. 2. In fact, Mr. Powell's report states that:

> [W]e did not receive actual and historical income and expense information from the owner and the client, and they would be pertinent to the assignment. We were instructed by the client to move forward with the appraisal report using market data. We have also relied upon historical and projected expenses from our prior appraisal report. **Our inability to obtain this information and consider it in our analysis may affect our value opinion.**

BB&T Exh. A at p. 71 (emphasis added). The Court finds Mr. Powell's calculation of operating expenses to be less reliable than Ms. Londono's because it relies heavily upon outdated historical data and market data which is only hypothetically applicable to the Property.

Mr. Powell attempted to cure these apparent deficiencies in his income capitalization analysis through an update letter dated March 29, 2012. *See* BB&T's Exh. D. In preparing this update letter, Mr. Powell re-inspected the Property, and reviewed the Debtor-in-Possession ("DIP") reports for October 2011 through February 2012. *See* ECF Nos. 118, 190, 220, 276, 307 and 319 (designated as Debtor's Exhs. 10-14, respectively). Mr. Powell prepared a summary of income and expenses based on his review of the DIP reports (*see* BB&T's Exh. D). Mr. Powell's update letter concludes that "the DIP reports support our value conclusion via the income capitalization approach as presented in our original appraisal." *See* BB&T's Exh. C at p. 2. However, Mr. Powell was only able to reach this conclusion by "annualizing the five months income & expenses, stabilizing one time expenses such as real estate taxes & insurance, adjusting repairs & maintenance for sewer pump out expenses (which will be eliminated with conversion to municipal sewer), removing the security expenses (an unnecessary expense), and taking administrative expenses to market." BB&T's Exh. C. at p. 2.

However, Mr. Powell did not consider certain aspects of the Debtor's actual operational history, to wit, the on-site security which the Debtor believes is a necessary expense for the Property, and which the Court authorized.  *See* ECF Nos. 115, 188, 198, 292 and 321[2] and Trans. of Evidentiary Hearing, p. 85:23-25 and 86:1-8.  Ms. Londono included security expenses within her expense line item for Payroll/Benefits, and testified that she believed security was a necessary expense for the Property based on its location, her inspection of the Property, and her interviews with the property manager regarding the prevalence of crime at the Property.  *See* Trans. of Evidentiary Hearing at p. 44-45.  Ms. Londono also concluded that security was a necessary expense based on her review of crime data within a ½ mile radius of the Property for the 30 days prior to her effective date of value, concluding that the Property's neighborhood "is considered to be a high crime area . . . ."  *See* Debtor's Exh. 1 at p. 24.

Mr. Powell's report does not contain an analysis of the crime demographics of the Property's neighborhood.  Instead, Mr. Powell testified that security is not a necessary expense because "it has operated historically at a high occupancy and with rents that are at market . . . ."  *See* Trans. of Evidentiary Hearing at p. 55:21-22.  Mr. Powell believes that security is an unnecessary expense because "the lack of security hasn't impacted the rents or the occupancy" and thus "a buyer would look at the history and they would see that there's no need for security, that the rents are at market and the occupancy is high."  *See* Trans. of Evidentiary Hearing at p. 56:19-21 and p. 82:16-18.

Even accepting Mr. Powell's assumption that security is only necessary if rental rates and occupancy rates would be affected, Mr. Powell did not review historical information regarding

---

[2]    The Court takes judicial notice of its own orders in this case pursuant to Fed. R. Bankr. P. 9017 and Fed. R. Evid. 201.  *See also In re Selinsky*, 365 B.R. 260, 262 n. 1 (Bankr. S.D. Fla. 2007) (Ray, J.).

rental or occupancy rates for any period after the first half of 2010 and before the Debtor began operating the Property in the fall of 2011. *See* Trans. of Evidentiary Hearing at p. 84-85. Therefore, Mr. Powell's testimony that security has had no effect on rental or occupancy rates is not reliable. The Court believes that security is a necessary expense for this Property and should be accounted for in the income capitalization approach to value, even if it does not directly affect rental or occupancy rates, because Florida Statute §723.022(2) requires that the Debtor maintain the Property's common areas "in a good sate of appearance, safety, and cleanliness."

The DIP reports further indicate that the Debtor is expending funds for the pump out of sewage. *See* BB&T's Exh. D. Ms. Londono's analysis included a line item for sewage pump out, consistent with the DIP reports, even though those expenses will be reduced or eliminated upon the Debtor's completion of an on-site waste water treatment facility. *See* Trans. of Evidentiary Hearing, p. 46:1-5. Ms. Londono explained that, based on her discussions with the Debtor's environmental engineer, there will be a $20,000 annual cost to maintain an onsite sewage treatment facility (*see* Trans. of Evidentiary Hearing, p. 45:8-11), and thus that it was appropriate for the repairs and maintenance line item to account "for either the repairs and maintenance associated with the septic as well as additional items or the cost of upkeep and maintenance for the sewage treatment facility." *See* Trans. of Evidentiary Hearing at p. 46:15-18.

Mr. Powell excluded the sewage pump out expenses because "they wouldn't be incurred once the new sewage plant is installed or if the subject were connected to the sewer system." *See* Trans. of Evidentiary Hearing, p. 54:10-15. However, Mr. Powell did not account for the expense of maintaining an onsite treatment plant; or the expense of maintaining a lift station necessary in connecting with the sewer system; nor a monthly impact fee chargeable by Miami-

Dade County in connection with a sewer connection. *See* Trans. of Evidentiary Hearing, pp. 89-90. Mr. Powell's failure to include sewer pump out expenses [based upon the assumption that those expenses would become unnecessary upon completion of an onsite treatment facility or sewer connection, without taking into account any ongoing maintenance expenses or fees to be incurred thereafter] leads this Court to conclude that his opinion is less credible and reliable than Ms. Londono's because Ms. Londono's analysis took these variables into account.

Ms. Londono concludes that a 12.5% capitalization rate is appropriate for the Property. Ms. Londono developed this capitalization rate based upon market extraction, market participant interviews, and a "band of investment" analysis. Ms. Londono's methodology in each of these regards is extensively discussed over three pages of her report. *See* Debtor's Exh. 1 at pp. 78-80. The Court finds Ms. Londono's report and testimony in this regard well supported and highly credible.

Mr. Powell's report states that "[b]ecause mobile home park capitalization rates are not apparent in the market due to the absence of sales, and because there are not a great deal of investors active in this market, we have based the capitalization rate on the latest Realty Rates investor survey for mobile home parks . . . ." *See* BB&T's Exh. A at p. 72. The referenced Realty Rates investor survey, for 3rd Quarter 2011, indicates an average surveyed rate of 9.86; Mr. Powell selected a slightly higher capitalization rate, 10.00%. *See* BB&T's Exh. A at p. 72. Mr. Powell's report contains no independent analysis using the "band of investments" technique. *See* Trans. of Evidentiary Hearing, p. 91:5-9. In connection with his March 29, 2012 update letter, Mr. Powell prepared a document entitled "Capitalization Rate considerations" which designates investment risk factors that should be considered and compared those risk factors to the Property. *See* BB&T's Exh. F and Trans. of Evidentiary Hearing at p. 94:17-25 and 95:1-9.

11

However, the "Capitalization Rate considerations" worksheet does not contain a quantitative application of the risk factors to the Property. Thus, based on the reports, the Court finds the capitalization rate selection is somewhere between 10% and 12.5%, but likely closer to the higher percentage rate, consistent with Ms. Londono's testimony in this regard.

Finally, the Court notes a difference in the opinion of Mr. Powell and Ms. Londono concerning the cost of permanently remediating environmental issues at the Property which relate to its septic system, as required by the Florida Department of Environmental Protection and the Miami-Dade County Department of Environmental Resource Management. *See* Official Records of Miami-Dade County, Book 27313, Page 3376 (the "Consent Order").[3] Mr. Powell's report estimated the cost of connecting to the County's sewer system at $1,077,000.00, and used this figure in ultimately reaching his conclusion of value. *See* BB&T's Exh. A at p. 36.

In contrast, Ms. Londono estimated the cost of on-site prepackaged water treatment plant at $645,000.00, based on information provided by the Debtor's environmental engineer. *See* Trans. of Evidentiary Hearing, p. 26:17-25 and p. 27:1-3. Although Mr. Powell used $1,077,000.00 in his October report (BB&T's Exh. A), Mr. Powell used $645,000.00 instead for his adjusted summary of income and expenses in connection with the March 29, 2012 update letter. *See* BB&T's Exh. E and Trans. of Evidentiary Hearing, p. 66:21-25, p. 67:1, and p. 94:9-16. For this reason, and because Ms. Londono's figure was based on information received directly from the Debtor's environmental engineer, the Court finds Ms. Londono's estimate of

---

[3] The Court takes judicial notice of this portion of the Miami-Dade public records pursuant to Fed. R. Bankr. P. 9017 and Fed. R. Evid. 201.

$645,000.00 for environmental remediation more reliable and credible than Mr. Powell's opinion and testimony in this regard.[4]

Finally, although neither expert placed much weight on any approach to value other than the income capitalization approach, Ms. Londono reconciled her conclusions on the sales comparison approach and land sales comparison approach to determine that a $60,000.00 reduction in the estimated value derived from the income capitalization approach was appropriate. *See* Debtor's Exh. 1 at p. 101. The Court finds nothing in the record to justify any further or other adjustments to the valuation derived from the income capitalization approach.

## **CONCLUSION**

The Court concludes that the income capitalization approach is the most reliable method to determine the value of the Property. The Court finds Ms. Londono's testimony and opinion more reliable than Mr. Powell's testimony and opinion with respect to: (i) the calculation of the effective gross income of the Property (including the calculation of the vacancy loss and credit factor); (ii) the calculation of the estimated net operating income of the Property; (iii) the selection of an appropriate capitalization rate for the Property; and (iv) the estimated costs of permanently remediating the environmental issues at the Property and complying with the Consent Order.

Therefore, for purposes of the income capitalization approach to value, (i) the appropriate effective gross income for the Property is $641,532; (ii) the appropriate total estimated expenses for the Property is $330,141, for an estimated net operating income of $311,391; (iii) the appropriate capitalization rate applicable to the property is 12%; and (iv) the appropriate

---

[4] Taking into account other factors such as the loss of mobile home pads in connection with the completion of the wastewater treatment facility, Ms. Londono used $706,737 in her final direct capitalization summation table. *See* Debtor's Exh. 1 at p. 81.

deduction for completion of the wastewater treatment plant is approximately $706,737. Ultimately, these considerations result in an estimated "As Is" Value (rounded) for the Property under the income capitalization approach to be $1,900,000.00 as of the date hereof.

Taking into account Ms. Londono's estimate for a downward adjustment to account for certain values derived from far less reliable methods, the Court finds the value of the Property is $1,875,000. Based on the foregoing, it is

ORDERED AND ADJUDGED that the Motion is GRANTED, and the as-is market value of a fee simple interest in the Property (as defined herein) is $1,875,000.00 as of April 12, 2012.

###

Submitted by:

Michael L. Schuster, Esq.
Genovese Joblove & Battista, P.A.
*Counsel to the Debtor*
100 SE Second Street, Suite 4400
Miami, FL 33131
 Tel: (305) 349-2300
Fax: (305) 349-2310
Email: mschuster@gjb-law.com

Copies furnished to:

Michael Schuster, Esq.

(Attorney Schuster shall serve a copy of this order on all parties upon whom the Motion was served)